NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2698-14T1

LISA R. WORTHY,

    Plaintiff-Appellant,

v.

KENNEDY HEALTH SYSTEM; KENNEDY
MEMORIAL HOSPITAL-CHERRY HILL;
UNIVERSITY HEADACHE CENTER;
MILLICENT KING-CHANNELL, D.O.;
ROBERT F. HAHN, D.O.; COURTNEY
BAKER, D.O.; SEAN HUBBARD, D.O.;
ANTHONY BABE, D.O.; STEPHANIE
MARANO, R.N.; KRISTINE M. BROWN,
R.N., and JOAN MAZZARELLA, R.N.,

    Defendants,

and

JOSEPH P. CURRERI,[1] D.O. and
THOMAS WETJEN, D.O.,

    Defendants-Respondents.

_____

> APPROVED FOR PUBLICATION
>
> **June 22, 2016**
>
> **APPELLATE DIVISION**

        Submitted March 14, 2016 - Decided June 22, 2016

        Before Judges Lihotz, Nugent and Higbee.

        On appeal from Superior Court of New Jersey,
        Law Division, Camden County, Docket No.
        L-4906-08.

---

[1] The caption mistakenly listed defendant's surname as Currieri, which we have corrected in our opinion.

Messa & Associates, P.C., attorneys for appellant (Joseph L. Messa, Jr., and A. Christine Giordano, on the briefs).

Ronan, Tuzzio & Giannone, P.C., attorneys for respondent Joseph P. Curreri, D.O. (James M. Ronan, Jr., of counsel and on the briefs; Anthony M. Tracy, on the briefs).

Blumberg & Wolk, LLC, attorneys for respondent Thomas Wetjen, D.O. (Christopher M. Wolk and Jeffrey P. Catalano, on the brief).

The opinion of the court was delivered by

LIHOTZ, P.J.A.D.

Plaintiff Lisa R. Worthy filed this medical negligence matter, alleging various defendants failed to properly diagnose and treat her medical condition. On appeal, we examine whether plaintiff met the requirements of Rule 4:26-4, the fictitious name rule, to save her claims against one defendant, which the trial judge dismissed as out of time. We also review proof supporting causation regarding another defendant, who successfully secured dismissal, arguing despite his alleged failure to diagnose and treat plaintiff's condition she would not have experienced a better outcome.

More specifically, plaintiff appeals from two orders granting summary judgment dismissal in favor of two physician-defendants. The first is a June 2, 2011 order in favor of defendant Thomas Wetjen, D.O., finding all claims barred by the

statute of limitations. The second is an April 11, 2014 order, concluding plaintiff failed to present evidence supporting proximate cause regarding the conduct of defendant Joseph P. Curreri, D.O. On the date set to commence trial against the remaining defendants, the parties resolved all claims. Plaintiff also appeals from the separate motions denying reconsideration of the summary judgment orders. Following our review of the parties' arguments, in light of the record and applicable law, we reverse.

I.

This matter arises from medical treatment and care plaintiff received in October 2006. We limit our recitation of facts and procedural history to the relevant issues presented on appeal.

Plaintiff, who had a history of migraine headaches and cervical disc disease, sought treatment from Robert Hahn, D.O. and defendant Millicent King-Channell, D.O. from September 17 to October 6, 2006. Despite various treatments, her ailments persisted. On the morning of October 6, 2006, plaintiff initially was treated by Dr. King-Channell, as a follow-up to her September 29 appointment and then referred to defendant Robert F. Hahn, D.O. for pain management and neck manipulation.

The same day plaintiff saw Dr. Hahn, who administered an injection and performed cervical spine manipulation therapy.

Following treatment, plaintiff took Xanax and Flexeril, which had been previously prescribed for her headaches, and went to work. After work, plaintiff and friends went to dinner, during which she consumed two beers and two glasses of wine. In the restaurant, plaintiff suffered "a syncopal episode," became semi-conscious, developed slurred speech, an abnormal gait and bilateral weakness. Emergency Medical Services were called and at 8:40 p.m., plaintiff was taken to Kennedy Memorial Hospital.

Upon arrival, an intake nurse performed an assessment and recorded plaintiff's report of a stabbing headache with nausea and vomiting. Plaintiff was coherent when answering questions, her eyes were open, and she obeyed commands; however, the nurse recorded symptoms of generalized weaknesses throughout her body, which she attributed to the use of alcohol and Xanax.

At 9:16 p.m., plaintiff was evaluated by an emergency medicine physician. The physician was ultimately identified in 2010, more than two years after he provided treatment, as defendant Dr. Wetjen.

Dr. Wetjen's notes stated plaintiff arrived at the hospital by emergency medical services and was experiencing dizziness, nausea, and vomiting after consuming two glasses of wine, two

beers, and taking Xanax and Flexeril. Dr. Wetjen observed plaintiff's pupils were sluggish as she followed commands and answered questions, but he concluded plaintiff's neurological examination was otherwise unremarkable. Dr. Wetjen opined plaintiff suffered an accidental polydrug overdose.

At 12:40 a.m., on October 7, 2006, plaintiff was administered anti-nausea medication and a CT scan was performed, which proved negative. At 6:30 a.m., the intake nurse noted plaintiff had an unstable gait and was having difficulty walking. At 11:00 a.m., plaintiff was transferred to the telemetry unit. Upon arrival, Courtney Baker, D.O., a first-year Kennedy staff resident, conducted a physical examination and prepared a treatment plan for plaintiff, who was awake but "nonresponsive." Dr. Baker relied on the emergency room records and family members' statements to formulate plaintiff's medical history. She diagnosed plaintiff with accidental polysubstance overdose.

Dr. Curreri first became involved when contacted by Dr. Baker, more than fifteen hours after plaintiff arrived at the emergency room. After Dr. Baker discussed plaintiff's condition, Dr. Curreri accepted plaintiff as his patient. He assumed responsibility for her at "around" noon on October 7, 2006. He assumed Dr. Baker obtained and reviewed the emergency

room chart, which he did not review until noon on October 8, 2006. Dr. Curreri concluded plaintiff's condition was consistent with polysubstance overdose. He also ordered a neurological consultation, which was not directed to be performed immediately, and prescribed aspirin.

Twenty-four hours later, Dr. Curreri examined plaintiff. At that time, his diagnosis included: aspirational bronchitis, hypophosphatemia, hypokalemia and a polysubstance overdose. He noted plaintiff's speech was incoherent, she was letheragic, and her mental status remained unchanged. Dr. Curreri asked the neurologist to examine plaintiff that day, which occurred.

Following a neurological consultation by defendant Sean Hubbard, D.O., plaintiff was transferred to Hahnemann University Hospital, where an MRA and MRI revealed a narrowing of the right vertebral artery, bilateral subacute thalamic infarcts, and left cerebellar subacute infarct of the vertebral artery. In short, plaintiff suffered a stroke. A cerebral angiography revealed a non-occlusive dissection of the right vertebral artery at C1-C2, secondary to mild irregularity. After receiving treatment at various facilities, plaintiff was discharged home on November 4, 2006.

On September 26, 2008, plaintiff filed a complaint asserting medical negligence, alleging the negligent

A-2698-14T1

manipulation of her neck caused vertebral artery dissection, a tear in an artery in the neck that supplies blood to the brain, which led to a stroke that was improperly diagnosed and treated. She named as defendants not only Drs. Hahn and King-Channell, but also Kennedy Health System (Kennedy), Kennedy Memorial Hospital — Cherry Hill, Joseph P. Curreri, D.O., along with several other doctors and nurses involved with plaintiff's care whose specific identities were not determined because plaintiff was unable to decipher their signatures on certain medical reports.

The complaint, in place of a typed name, placed these defendants' signatures in the caption along with a fictitious party reference. As to each unknown professional, his or her scanned undecipherable signature along with the identification of his or her title, i.e., doctor or nurse. Further, throughout the body of the complaint the signature is included when reciting factual underpinnings of alleged negligence for which plaintiff asserted his or her liability.

Kennedy accepted service on behalf of Kennedy Health System, Kennedy Memorial Hospital, and Stephanie Marano, RN, but declined to accepted service on behalf of the remaining nine defendants. Returning the remaining summonses, Kennedy advised the named physicians must be served through their offices.

Specifically as to the unidentified defendants, Kennedy identified one intern and stated "[t]he remaining names and signatures were unidentifiable." Plaintiff's counsel requested Kennedy's legal liaison identify "the individuals who authored the medical records contained in [plaintiff's] chart." However, she was unable to do so.

On November 18, 2008, plaintiff wrote to Kennedy's legal liaison, stating:

> You have refused to accept service of the [c]omplaints for several of the defendants. These defendants are identified with particularity in the [c]omplaint and are clearly agents, servants and/or employees of Kennedy Health System. The identity of these individuals is information that is in the sole possession, custody and control of Kennedy Health System. Therefore, any attempts by you to avoid service on these individuals is improper. As such, kindly accept service on behalf of your agents, servants, employees and identify the individuals who authored the medical records contained in [plaintiff]'s chart.

On November 16, 2009, plaintiff served twelve supplemental interrogatories directing Kennedy and the other defendants to provide the identity and job title of each of the six defendants designated by their signature in the complaint, which again was reproduced in the discovery request. When no response was forthcoming by January 19, 2010, additional correspondence renewed the request and sought voluntary compliance in an effort

8                                                    A-2698-14T1

to avoid motion practice. Kennedy "informal[ly]" responded on February 17, 2010, stating "despite good faith efforts" it could not identify three of the treatment providers, but noted their job titles. Two signatures were identified and no information was provided regarding the remaining signature. Plaintiff moved to strike Kennedy's answer and defenses for failure to provide discovery, returnable on March 5, 2010.

On March 3, 2010, Kennedy sent a second "informal response" to plaintiff's supplemental interrogatories. It addressed the one signature not mentioned in its prior response, stating the document on which the signature appeared was not generated by Kennedy, but was believed to be from a provider rendering treatment prior to plaintiff's admission to Kennedy. Kennedy provided the identifications of Dr. Wetjen, a resident physician and three nurses. Within a week, plaintiff sought leave to amend the complaint, specifically substituting the names and titles for the scanned signatures of defendants as revealed by Kennedy, which was granted. Plaintiff also moved to restore the now identified defendants to the active trial status, which was also granted.[2]

---

[2] The record also references plaintiff "had to seek court intervention so that a witness could be produced [by Kennedy] to identify signatures of the remaining defendants in the case."
(continued)

Dr. Wetjen answered the complaint on November 24, 2010, and, thereafter, moved for summary judgment, arguing plaintiff's claim was barred by the statute of limitations and the improper use of the fictitious party pleading rule did not save her complaint from being untimely filed. After oral argument, the trial judge granted Dr. Wetjen's motion on June 2, 2011.

Focusing on the absence of efforts to identify the defendants prior to October 6, 2008, the trial judge rejected plaintiff's contention the inclusion of defendants' signatures sufficiently preserved her claims, making them timely. Although finding no prejudice to Dr. Wetjen, the judge noted plaintiff exercised no due diligence to ascertain Dr. Wetjen's identity prior to initiating her legal action and, therefore, he rejected reliance on the fictitious name procedure. Finally, the judge was unpersuaded by plaintiff's alternative argument to apply the discovery rule, delaying commencement of the statute of limitations to August 6, 2008, the date plaintiff first consulted counsel, finding the assertion unsupported.

<hr>

(continued)
The designated witness, deposed on May 14, 2010, identified Dr. Wetjen's signature. These pleadings are not in the record.

The June 2, 2011 order dismissed the complaint as to Dr. Wetjen, with prejudice. Reconsideration was denied.[3]

On March 13, 2014, Dr. Curreri moved for summary judgment. He argued plaintiff failed to establish his conduct was a proximate cause of or a substantial contributing factor to plaintiff's injuries. Dr. Curreri maintained "plaintiff had not submitted sufficient expert proofs to establish that there was treatment available as of . . . noon on October 7, 2006, (the time when Dr. Curreri first became involved in the care of plaintiff), that could have improved or otherwise changed the ultimate outcome in some material respect." Because plaintiff's expert identified noon on October 7, 2006 as a critical time period for necessary treatment to be administered, and Dr. Curreri actually saw plaintiff after that time on October 7, 2006, he argued had he administered any treatments as asserted by plaintiff, the final outcome would not have changed.

---

[3] The orders entered on July 22, 2011 cause some confusion. First, a July 22 order dismissed the complaint against Dr. Wetjen with prejudice. A second order denied plaintiff's motion for reconsideration of the summary judgment dismissal. A July 28, 2011 order prepared by the court simply states, "The [o]rder signed on July 22, 2011 in regard [to] the above captioned matter referencing Thomas Wetjen, DO is hereby vacated." Finally an order, which has an illegible date and no file stamp, presumably entered on August 5, 2011, denied reconsideration of the summary judgment dismissal of Dr. Wetjen. Notwithstanding the confusion created by these orders, plaintiff does not dispute summary judgment was granted in favor of Dr. Wetjen, who was dismissed from the case.

In response, plaintiff refuted the factual assertions, noting testimony from Dr. Baker stated she called Dr. Curreri after plaintiff's admission on the evening of October 6, 2006 to discuss a treatment plan, which he approved. Dr. Baker again consulted with Dr. Curreri by telephone when she resumed her shift at 7 a.m. on October 7, 2006. Dr. Curreri suggests the call was not made until noon on that date.

The trial judge concluded Dr. Curreri had no contact with plaintiff until sometime after noon on October 7, 2006, stating:

> I don't see facts in dispute on that point, and that point being when Dr. Curreri came into contact with the patient. I find based on what is . . . in the evidence from the testimony of the parties, [Dr. Baker], as well as Dr. Curreri and the notes, his contact and his laying out a plan for the care of . . . [plaintiff] . . . that all attaches at . . . noon . . . timeframe on the 7th.
>
> And it's clear that the testimony from [plaintiff's expert] is that the potential options with respect to a patient of this nature at that point in time would have been the heparin treatment. . . . And he cannot give an opinion that there would have been a better outcome had[,] at that point in time[,] Dr. Curreri ordered heparin treatment. And without that in the record, I can't hold the doctor in. So I'm going to grant summary judgment as to Dr. Curreri.

Reconsideration was denied.

Plaintiff appealed from the June 2 and August 5, 2011 orders dismissing all claims against Dr. Wetjen. She

12

subsequently amended the notice of appeal to include the April 11 and May 23, 2014 orders dismissing all claims against Dr. Curreri.

## II.

We "review[] an order granting summary judgment in accordance with the same standard as the motion judge." Bhagat v. Bhagat, 217 N.J. 22, 38 (2014). See also Townsend v. Pierre, 221 N.J. 36, 59 (2015). We "must review the competent evidential materials submitted by the parties to identify whether there are genuine issues of material fact and, if not, whether the moving party is entitled to summary judgment as a matter of law." Bhagat, supra, 217 N.J. at 38. See Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995); R. 4:46-2(c).

Further, all facts are viewed in a light most favorable to the non-moving party, "keeping in mind '[a]n issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion . . . would require submission of the issue to the trier of fact.'" Schiavo v. Marina Dist. Dev. Co., 442 N.J. Super. 346, 366 (App. Div. 2015) (alteration in original) (quoting R. 4:46-2(c)), certif. denied, 224 N.J. 124 (2016).

A motion for summary judgment will not be defeated by bare conclusions lacking factual support, Petersen v. Twp. of Raritan, 418 N.J. Super. 125, 132 (App. Div. 2011), self-serving statements, Heyert v. Taddese, 431 N.J. Super. 388, 413-14 (App. Div. 2013), or disputed facts "of an insubstantial nature." Pressler & Verniero, Current N.J. Court Rules, cmt. 2.1 on R. 4:46-2 (2016). "It is evidence that must be relied upon to establish a genuine issue of fact. 'Competent opposition requires competent evidential material beyond mere speculation and fanciful arguments.'" Cortez v. Gindhart, 435 N.J. Super. 589, 605 (App. Div. 2014) (quoting Hoffman v. Asseenontv.Com, Inc., 404 N.J. Super. 415, 425-26 (App. Div. 2009)), certif. denied, 220 N.J. 269 (2015).

"The practical effect of this rule is that neither the motion court nor an appellate court can ignore the elements of the cause of action or the evidential standard governing the cause of action." Bhagat, supra, 217 N.J. at 38. It is only "when the evidence 'is so one-sided that one party must prevail as a matter of law,' the trial court should not hesitate to grant summary judgment." Brill, supra, 142 N.J. at 540 (citation omitted) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 2512, 91 L. Ed. 2d 202, 214 (1986)).

Once we agree no genuinely disputed fact exists, we "then decide whether the trial court's ruling on the law was correct." W.J.A. v. D.A., 210 N.J. 229, 238 (2012) (quoting Henry v. N.J. Dept. of Human Servs., 204 N.J. 320, 330 (2010)). Such a determination is "not entitled to any special deference," and is subject to de novo review. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

## III.

We separately review plaintiff's challenge to the two summary judgment orders.

## A.

As to Dr. Wetjen, plaintiff initially argues her complaint was timely filed under the discovery rule. She maintains a material factual dispute exists whether the two-year statute of limitations for medical negligence cases, N.J.S.A. 2A:14-2(a), was tolled because she did not discover the right to legal recourse until she spoke to counsel on August 6, 2008. We disagree.

"Under special circumstances and in the interest of justice, [New Jersey has] adopted the discovery rule to postpone the accrual of a cause of action when a plaintiff does not and cannot know the facts that constitute an actionable claim." Grunwald v. Bronkesh, 131 N.J. 483, 492 (1993); see also Baird

v. Am. Med. Optics, 155 N.J. 54, 65 (1998) ("The discovery rule delays the accrual of a cause of action until 'the injured party discovers, or by an exercise of reasonable diligence and intelligence should have discovered that he may have a basis for an actionable claim.'" (quoting Lopez v. Swyer, 62 N.J. 267, 272 (1973))).

"The discovery rule is a rule of equity that ameliorates 'the often harsh and unjust results [that] flow from a rigid and automatic adherence to a strict rule of law.'" Grunwald, supra, 131 N.J. at 492 (alteration in original) (quoting Lopez, supra, 62 N.J. at 273-74). "The question is whether the facts presented would alert a reasonable person exercising ordinary diligence that he or she was injured due to the fault of another." Martinez v. Cooper Hosp.-Univ. Med. Ctr., 163 N.J. 45, 52 (2000). A plaintiff bears the burden of proving he or she was aware of an injury and "that the injury [was] attributable to the fault of another." Id. at 53. However, a plaintiff who merely lacks "knowledge of a specific basis for legal liability or a provable cause of action" may not receive the benefit of the discovery rule. Id. at 52.

Certainly plaintiff knew she suffered a stroke in October 2006. Nothing suggests she was misled regarding her diagnosis or the nature of her care. Lynch v. Rubacky, 85 N.J. 65, 67-69,

77 (1981). In fact, her certification only reflects she discovered she could pursue legal redress after she met with her attorney, not that she was unaware of her injury. <u>Szczuvelek v. Harborside Healthcare Woods Edge</u>, 182 <u>N.J.</u> 275, 280, 283 (2005). "To accept the premise that the statute did not begin to run until she was advised by her attorney . . . would be to disregard the basic policy of repose, which underlies the statute of limitations, thus extending the threat of litigation indefinitely." <u>Rankin v. Sowinski</u>, 119 <u>N.J. Super.</u> 393, 401 (App. Div. 1972). As a result, we conclude the discovery rule does not apply.

However, we find compelling plaintiff's argument she properly complied with the fictitious pleading rule, allowing the cause of action against Dr. Wetjen to relate back to the date her complaint was filed, which was within two years of her injury.

Pursuant to <u>Rule</u> 4:26-4, "if the defendant's true name is unknown to the plaintiff, process may issue against the defendant under a fictitious name, stating it to be fictitious and adding an appropriate description sufficient for identification." "The fictitious defendant rule was promulgated to address the situation in which a plaintiff is aware of a cause of action against a defendant but does not know that

defendant's identity." Gallagher v. Burdette-Tomlin Med. Hosp., 318 N.J. Super. 485, 492 (App. Div. 1999), aff'd, 163 N.J. 38 (2000). The rule's effect is to "render timely the complaint filed by a diligent plaintiff, who is aware of a cause of action against an identified defendant but does not know the defendant's name." Greczyn v. Colgate-Palmolive, 183 N.J. 5, 11 (2005). When the plaintiff discovers the party's name, "amendment of the complaint may relate back [to] allow an action otherwise time-barred." Brown v. Kennedy Mem'l Hosp.-Univ. Med. Ctr., 312 N.J. Super. 579, 587 (App. Div.), certif. denied, 156 N.J. 426 (1998). Accordingly, if a defendant is properly identified by a fictitious name before expiration of the applicable limitations period, an amended complaint substituting a fictitiously named defendant's true name will relate back to the date of filing of the original complaint. Viviano v. CBS, Inc., 101 N.J. 538, 548 (1986); Farrell v. Votator Div. of Chemetron Corp., 62 N.J. 111, 120-23 (1973); see also R. 4:9-3 (allowing an amended complaint to relate back to the initial complaint).

The trial judge heavily relied on the principle that "[t]he identification of a defendant by a fictitious name . . . may be used only if a defendant's true name cannot be ascertained by the exercise of due diligence prior to filing the complaint."

18                                                        A-2698-14T1

<u>Claypotch v. Heller, Inc.</u>, 360 <u>N.J. Super.</u> 472, 479-80 (App. Div. 2003) (citing <u>Mears v. Sandoz Pharms. Inc.</u>, 300 <u>N.J. Super.</u> 622, 631-33 (App. Div. 1997)). This requires a plaintiff to proceed with due diligence in ascertaining the fictitiously identified defendant's true name. <u>Farrell</u>, <u>supra</u>, 62 <u>N.J.</u> at 120; <u>Johnston v. Muhlenberg Reg'l Med. Ctr.</u>, 326 <u>N.J. Super.</u> 203, 208 (App. Div. 1999).

Here, the judge had difficulty accepting the use of signatures to identify the unknown professionals. He correctly noted no specific authority allowed a party to paste a signature in lieu of naming a party in the caption. Had plaintiff done nothing more, we might easily reject such a practice. However, fundamental fairness demands consideration of the totality of the facts and circumstances before the ultimate sanction of dismissal with prejudice issues. Following such a review, we conclude these facts support counsel undertook the required diligent inquiry.

The complaint did much more than simply include the pasted signatures in the caption. Plaintiff utilized the information available from Kennedy's records and identified not only the professional's title, but also recited the factual basis for liability. She further included the more traditionally found John and Jane Doe references and a separate count for those

defendants. These efforts were designed to relate as much known information as possible to specify the unidentified professionals.

Regarding diligence, while Dr. Wetjen was not identified before the complaint was filed, this was not because counsel was dilatory. The facts show plaintiff first understood she had a right to file an action when she met with counsel on August 6, 2008, very near the expiration of the statute of limitations. Counsel proceeded to gather Kennedy's records, obtain an affidavit of merit and file a complaint in less than two months. From that point, Kennedy was repeatedly asked formally and informally to identify the "agents, servants, [or] employees" who signed its charts. Letters, discovery requests and motions to produce a witness to identify the signatures were issued. For the most part, Kennedy ignored the requests, despite the fact it exclusively controlled the pertinent information, at all times. Kennedy did not release identification information until the return date of plaintiff's motion to strike Kennedy's answer and defenses approached. Only then did Kennedy issue an "informal response" to plaintiff's supplemental interrogatories. Had Kennedy responded when plaintiff first asked, Dr. Wetjen would have been identified and served within a week of the original filing.

Unlike the authority relied upon by Dr. Wetjen, see Johnston, 326 N.J. Super. at 205 (describing how the plaintiff did not seek to add the newly identified party after waiting almost a year once identified), here, plaintiff moved to amend her complaint within days of learning Dr. Wetjen's identity.

Nor can we conclude plaintiff failed to investigate potential claims against a physician whose name appeared multiple times in her medical chart. See Matynska v. Fried, 175 N.J. 51, 54 (2002) (denying application of equitable tolling principles when information was readily available). In this matter, the names were not easily obtained from the medical records and Kennedy was not forthcoming in providing actual identifications.

Perhaps most importantly, Dr. Wetjen was not prejudiced by the delay in formal identification as a potentially liable party and the ultimate service of an amended complaint. Farrell, supra, 62 N.J. at 122-23. Nothing impaired his ability to defend the action. Mears, supra, 300 N.J. Super. at 631.

"Justice impels strongly towards affording the plaintiff[] [her] day in court on the merits" of her claims. Farrell, supra, 62 N.J. at 122; see also Fede v. Clara Maass Hosp., 221 N.J. Super. 329, 339 (Law Div. 1987) (stating a motion to dismiss on statute-of-limitations grounds in the context of

21

fictitious party practice is governed by "the interests of justice.").

Following our review, we conclude plaintiff engaged in diligent efforts, which were continually thwarted by Kennedy. For more than fifteen months, Kennedy declined to provide the requested identification of the doctors and nurses who attended to plaintiff in its facility, as confirmed by their signatures on charts, records and reports. The delay here falls squarely on Kennedy's gradual response, which fairness dictates shall not be shouldered by plaintiff. The motion judge's findings to the contrary are not supported. The decision to dismiss Dr. Wetjen is reversed and the June 2 and August 5, 2011 orders are vacated.

### B.

We turn to the order granting summary judgment to Dr. Curreri. Among the claims stated in her complaint, plaintiff alleges Dr. Curreri failed to diagnose, order diagnostic testing and treat her stroke, misdiagnosed her condition, and failed to alter treatment despite her failure to improve for more than seventeen hours. The motion judge found plaintiff's expert "c[ould] not give an opinion that there would have been a better outcome had at that point in time Dr. Curreri ordered heparin treatment." Plaintiff argues this was an abuse of discretion

because materially disputed facts were presented to support causation that would defeat summary judgment.

"A medical malpractice case is a kind of tort action in which the traditional negligence elements are refined to reflect the professional setting of a physician-patient relationship." Verdicchio v. Ricca, 179 N.J. 1, 23 (2004). To establish a prima facie case for medical negligence, "a plaintiff must present expert testimony establishing (1) the applicable standard of care; (2) a deviation from that standard of care; and (3) that the deviation proximately caused the injury[.]" Koseoglu v. Wry, 431 N.J. Super. 140, 156 (App. Div. 2013) (alteration in original) (quoting Gardner v. Pawliw, 150 N.J. 359, 375 (1997)), certif. denied, 216 N.J. 4 (2013).

Under certain circumstances, a plaintiff "must prove that, as a result of a defendant's negligence, she experienced an increased risk of harm from that condition, and that the increased risk of harm was a substantial factor in causing the injury ultimately sustained." Gardner, supra, 150 N.J. at 375 (citing Anderson v. Picciotti, 144 N.J. 195, 210 (1996)).

> The substantial factor test allows the plaintiff to submit to the jury not whether "but for" defendant's negligence the injury would not have occurred[,] but "whether the defendant's deviation from standard medical practice increased a patient's risk of harm or diminished a patient's chance of survival and whether such increased risk was a

substantial factor in producing the ultimate harm." [Gardner, supra, 150 N.J. at 376]. Once the plaintiff demonstrates that the defendant's negligence actually increased the risk of an injury that later occurs, that conduct is deemed to be a cause "in fact" of the injury and the jury must then determine the proximate cause question: whether the increased risk was a substantial factor in bringing about the harm that occurred.

[Verdicchio, supra, 179 N.J. at 24.]

Plaintiff maintains her symptoms evident upon admission, including her eyes gazing to the right, suggested a need for a neurological consultation. However, Dr. Curreri did not examine plaintiff for twenty-four hours after she was admitted to his service, and the neurological exam, although ordered, was not deemed urgent and was further delayed.

Plaintiff's expert Louis R. Caplan, M.D. stated there was a need to consider a differentiated diagnosis before concluding plaintiff suffered a polysubstance overdose. In his report, he opined treating physicians ignored plaintiff's symptoms as suggesting the more serious condition, stating:

If Dr. Hubbard and the other healthcare providers at Kennedy Memorial Hospital involved in [plaintiff]'s care and treatment had identified that this was a neurologic emergency then [plaintiff] would have been considered for thrombolytic and or anticoagulant treatment. As a result of the negligence of the defendants, [plaintiff] has permanent neurological injuries[,] which

24

could have been prevented had the defendants acted within the standard of care.

In his deposition testimony, Dr. Caplan reiterated that no tests to determine whether plaintiff suffered a neurological event were performed. Consequently, because "no adequate investigation [and] no adequate differential diagnosis" was performed, no treatment was administered. He also identified other investigative procedures aiding a differentiated neurological diagnosis, such as an MRI or MRA, would lead to a course of treatment. Moreover, if the attending physician was not trained in the area at issue, he or she was obligated to call a trained and experienced neurologist to assist in the diagnosis.

Both the trial judge and Dr. Curreri rely on this colloquy as demonstrating lack of causation:

> [DR. CURRERI'S COUNSEL]: If Heparin had been administered to this patient by 12:00 noon on October 7, can you state an opinion that this patient's outcome probably would have been better.
>
> [DR. CAPLAN]: No.

However, important to any analysis is the remainder of Dr. Caplan's testimony, as follows:

> Q. If heparin had been administered by 12:00 noon on October 7, am I correct that you cannot, therefore, state that the failure to give heparin by 12:00 noon on October 7, was a substantial factor in

increasing the risk and harm to this patient?

. . . .

A. No, I don't think that necessarily follows. You asked me if she'd been given it at 12:00 noon. I can't say that would have . . . made a difference. It depends on when it was given whether it was more likely than not that it would have been helpful. But that would cover the time period between when she came into the hospital and 12:00 noon the next day. That's the point at issue.

. . . .

Q. If heparin had been given at any point between 11:00 p.m. on the 6th and 12:00 noon on October 7, can you state the opinion that the patient's outcome probably would have been better?

A. The difficulty in answering the question — I'd say this: I can't answer yes or no. The reason I can't is we have inadequate information. So it would depend on what the findings were. As I said, we don't have really a good detailed neurological full examination early. We don't have one really later. So I'm saying that I think she got worse, but that's a little hard to be absolutely certain. We don't have an imaging test. So we don't know if the imaging changed. And we don't know when it would have been given.

So the answer is it would have given her more chance depending on what the findings were. Now, we don't know the findings. So I can't really answer the question. I can't answer yes or no. I think it might have given her more of a chance if it was given at the appropriate

A-2698-14T1

time after the appropriate imaging was done depending on what the findings were.

When asked whether a decision to administer heparin at noon on October 7 would have complied with the standard of care, Dr. Caplan stated it would have made a difference and would have complied with the standard of care.

Other facts also impact this issue. Dr. Baker, a Kennedy staff intern who treated plaintiff following her admission to the hospital, contacted Dr. Curreri to accept plaintiff as his patient. Dr. Baker's memory of events is poor, but her hospital notes record certain symptoms that prompted a neurological consultation. Yet, Dr. Curreri did not order an expedited consultation, causing its performance to be delayed for more than twenty-four hours. Dr. Curreri accepted Dr. Baker's diagnosis. However, he agreed if any evaluation does not consider a diagnosis, tests would not be initially ordered. Dr. Curreri acknowledged he did not consider an alternate neurological diagnosis and, therefore, did not order additional testing.

Viewing this record, in a light most favorable to plaintiff as we must, we conclude the facts, including the expert opinion, could support a finding Dr. Curreri deviated from the accepted standard of care in failing to develop a differentiated neurological diagnosis and, therefore, pursue an alternative

27                                                                      A-2698-14T1

course of medical treatment, which was a substantial factor in contributing to the injuries plaintiff sustained. <u>Gardner</u>, <u>supra</u>, 150 <u>N.J.</u> at 375.

The trial judge concluded Dr. Caplan did not assert "<u>there would have been a better outcome</u> had[,] at that point in time[,] Dr. Curreri ordered heparin treatment." (Emphasis added). However, this is not the legal standard. "The substantial factor test of causation requires the jury to determine whether the deviation, in the context of the patient's preexistent condition, was sufficiently significant in relation to the eventual harm to satisfy the requirement of proximate cause." <u>Roses v. Feldman</u>, 257 <u>N.J. Super.</u> 214, 218 (App. Div. 1992) (quoting <u>Battenfeld v. Gregory</u>, 247 <u>N.J. Super.</u> 538, 546-47 (App. Div. 1991)). It then "becomes a jury question whether or not that increased risk constituted a substantial factor in producing the injury." <u>Id.</u> at 217 (quoting <u>Battenfeld</u>, <u>supra</u>, 247 <u>N.J. Super.</u> at 546-47).

The motion judge's conclusion considered only a portion of Dr. Caplan's factual testimony. The expert opined had Dr. Curreri acted when first advised of plaintiff's condition, although he could "not be certain" because no testing was performed, he believed "it would have given her more of a chance . . . depending on what the findings were." Accordingly, the

jury must determine whether Dr. Curreri's conduct was a substantial factor in causing plaintiff's damages. Put another way, "plaintiff's claim . . . from delayed diagnosis and treatment will not be diminished or defeated by a demonstration that delay itself was not the cause of her ultimate physical injury." Evers v. Dollinger, 95 N.J. 399, 411 (1984). The judge's erroneous analysis must be reversed and summary judgment dismissal vacated.

## IV.

In conclusion, we affirm the rejection of the discovery rule as applicable here, but reverse the summary judgment dismissal of claims against Dr. Wetjen, finding plaintiff's timely complaint properly utilized the fictitious party procedure. Plaintiff diligently pursued the identity of Dr. Wetjen and promptly amended her pleadings when Kennedy finally complied with discovery requests. Further, the judge improperly granted summary judgment, dismissing Dr. Curreri. Not only did the judge overlook evidence of causation provided by plaintiff's expert, he employed the incorrect legal standard when assessing the facts.

Accordingly, we reverse the June 2, 2011 and April 11, 2014 summary judgment orders, as well as the orders denying

reconsideration. The matter is remanded for further proceedings.

Reversed and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2698-14T1