**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3680-18T3

ARMANDO RIOS, JR.,

 Plaintiff-Appellant,

v.

MEDA PHARMACEUTICAL,
INC., TINA CHENG-AVERY,
and GLENN GNIRREP,

 Defendants-Respondents,

and

MYLAN INC.,

 Defendant.

_____

Argued telephonically May 6, 2020 –
Decided July 1, 2020

Before Judges Koblitz, Whipple, and Mawla.

On appeal from the Superior Court of New Jersey, Law
Division, Morris County, Docket No. L-0763-17.

William R. Stoltz argued the cause for appellant (Law Offices Rosemarie Arnold, attorneys; Maria Luppino and William R. Stoltz, on the briefs).

John M. Losinger argued the cause for respondents (Wilson Sonsini Goodrich & Rosati, PC, and Saiber LLC, attorneys; Marina C. Tsatalis and John M. Losinger, on the brief).

PER CURIAM

Plaintiff Armando Rios, Jr. appeals from a March 20, 2019 summary judgment dismissal of his complaint against defendants Meda Pharmaceuticals, Inc. (Meda), Tina Cheng-Avery, and Glenn Gnirrep. We affirm.

Plaintiff, a Hispanic male, was hired in May 2015 in the Marketing Department at Meda after being personally interviewed by Tina Cheng-Avery, her supervisor Stuart Loesch, and other executives. Plaintiff's employment was "at will," meaning he could be terminated at any time with or without cause, which plaintiff acknowledged by signing the offer letter.

Cheng-Avery, who had recommended to Loesch that they hire plaintiff, was plaintiff's direct supervisor. Soon after plaintiff began working, she began documenting his performance, maintaining a document entitled "2015-2016 Performance Observations—Armando Rios." In it, she listed specific deficiencies with plaintiff's performance and the dates on which she met with

plaintiff to counsel him on what she and Loesch believed he needed to do to improve his performance.

Plaintiff asserts that in the first few months of his employment, there were four events he contends constitute the basis of a hostile work environment claim. First, plaintiff asserted that in June 2015, while he and Cheng-Avery were alone in her office, he told her he and his wife were looking for a new home, to which she allegedly responded "it must be hard for a [s]pic to have to get FHA[1] loans." He claimed he shared the incident with Gnirrep,[2] the Director of Human Resources (HR), probably within twenty-four hours, but Gnirrep did not take notes, and plaintiff did not produce any written record of his own. Nor did plaintiff file a formal complaint, as he thought "speaking with [Gnirrep] would maybe initiate some procedures as he was the head of HR . . . . I was only in my role for a very short time so I was a little nervous and scared."

Plaintiff asserted he met with Gnirrep again about a month later after Cheng-Avery made a second comment while casting a role for a commercial that an actress "would work if she didn't look too [s]pic[-]y." The third incident plaintiff alleged was in September 2015; he asserted that while he was within

---

[1] Federal Housing Administration.

[2] Gnirrep passed away unexpectedly in August 2018 and was never deposed.

earshot, Cheng-Avery made a comment to two of plaintiff's female co-workers, a peer and a subordinate, "about leveraging girl power, that girls gotta stick together to . . . solidarity to push the business forward." He alleged he told Gnirrep within twenty-four hours. The fourth incident occurred in late 2015, when plaintiff contends the same co-workers, and a third, told him that Cheng-Avery thought the men in certain departments were not as competent as the women.

In February 2016, after plaintiff's poor performance at a January 2016 marketing conference was reported to Cheng-Avery by both an internal employee and outside vendor Emerson Group, she and Loesch placed plaintiff on probation. They informed plaintiff he would be reevaluated at the end of May, but if they saw no immediate and substantial improvement before then he was subject to additional action, up to and including termination. Plaintiff wrote a memorandum responding to the alleged performance deficiencies point-by-point, which he asserted he delivered to Gnirrep to give to Cheng-Avery.

A month later, in March 2016, plaintiff received a negative year-end performance review and was given a detailed performance improvement plan. After weekly meetings with Cheng-Avery as part of this performance improvement plan, plaintiff improved only slightly over the next two months;

4

an April 21 email indicated his level of improvement was unacceptable and reminded him he must show immediate and significant improvement.

At the end of May 2016, plaintiff asked to meet with Matt Holley, general counsel for Meda, to report that he believed Meda violated the Physicians Payment Sunshine Act (Sunshine Act)[3] for improper hiring on two occasions; he asserted he also had previously made a verbal report to Gnirrep as to one of those allegedly-improper hires in January 2016. The day after his meeting with Holley, plaintiff's employment was terminated by Cheng-Avery and Loesch.

Plaintiff filed a complaint in March 2017 and asserted claims under the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14, for wrongful termination based on his Sunshine Act reports, and under the New Jersey Law Against Discrimination (NJLAD), N.J.S.A. 10:5-1 to -49, for harassment and hostile work environment based on his national origin and gender.

Plaintiff's complaint asserted five counts. Count one alleged that Cheng-Avery, as his supervisor, created a hostile work environment by making

---

[3]  42 U.S.C. § 1320a-7h, enacted as part of the Affordable Care Act, requires pharmaceutical manufacturers that participate in federal health care programs to track and report payments and transfers of value given to physicians and teaching hospitals.

comments about both his national origin and his gender—the two "spic" comments and the "girl power" reference—as well as by favoring female employees and calling male employees unworthy. Plaintiff alleged Cheng-Avery retaliated for his complaints to Gnirrep by taking staff away to ensure he was unable to perform his job, and also took job responsibilities away from plaintiff and assigned them to female employees to punish, embarrass, and humiliate him, as well as to discriminate against him because he is Hispanic and male.

Count two alleged Gnirrep had a duty to timely and fairly investigate plaintiff's complaints and take steps to prevent a hostile work environment and national origin and gender discrimination, but that he did not do so and rather allowed Cheng-Avery to remain in a supervisory role over plaintiff. Plaintiff contended Gnirrep told Cheng-Avery about his complaints, which made her discrimination and harassment of plaintiff worse.

Count three asserted Meda had a duty to have a well-publicized and effective training program and monitoring mechanism through which an anti-discrimination policy or anti-harassment policy could be enforced, and they failed to do so.

A-3680-18T3

Count four alleged plaintiff discovered Meda violated the Sunshine Act, and that when he reported this to Holley on May 31, 2016, he was subjected to retaliation by Meda, Cheng-Avery, and Gnirrep in that he was "wrongfully terminated the day after his report." Plaintiff contended there was a causal connection between his reporting and his termination. Count five alleged Cheng-Avery engaged in conduct to cause plaintiff severe emotional distress.

After the conclusion of discovery, defendants filed a motion for summary judgment. On March 20, 2019, after a hearing, the court granted defendants summary judgment on all counts and issued a thorough written decision. This appeal followed.

I.

We review a grant of summary judgment de novo, applying the same standard as the trial court. Globe Motor Co. v. Igdalev, 225 N.J. 469, 479 (2016). Under Rule 4:46-2(c), a motion for summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." A genuine issue of material fact exists where, when viewed in the light most favorable to the nonmoving

7

party, a rational factfinder could find in favor of the non-moving party. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523, 540 (1995).

It is not enough to produce "bare conclusions lacking factual support" or "self-serving statements." Worthy v. Kennedy Health Sys., 446 N.J. Super. 71, 85 (App. Div. 2016) (citations omitted). The non-movant must produce "competent evidential material beyond mere speculation and fanciful arguments." Ibid. (citations omitted). Although a court is not to make credibility determinations, the court is not required "to turn a blind eye to the weight of the evidence; the 'opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" Triffin v. Am. Intern. Grp., Inc., 372 N.J. Super. 517, 523-24 (App. Div. 2004) (quoting Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d. Cir. 1992)).

On appeal, plaintiff argues summary judgment was improvidently granted because he raised genuine issues of material fact as to the reason he was fired; as to whether the alleged discriminatory conduct of defendants was severe or pervasive so as to support a hostile work environment claim; and as to whether defendants' proffered reasons for his firing were pretextual. He also argues the court should have permitted an amendment to his complaint.

II.

A-3680-18T3

We first address plaintiff's CEPA claim. N.J.S.A. 34:19-1 to -14 was enacted to protect employees and to encourage them to report illegal or unethical activities in the workplace, as well as to discourage employers in both the public and private sector from engaging in such conduct. Dzwonar v. McDevitt, 177 N.J. 451, 461 (2003) (citing Abbamont v. Piscataway Twp. Bd. Of Educ., 138 N.J. 405, 431 (1994)). N.J.S.A. 34:19-3(c), in relevant part, states that an employer shall not take any retaliatory action against an employee because the employee objects to an activity, policy, or practice which the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law.

A plaintiff bringing a cause of action under N.J.S.A. 34:19-3(c) must show that: (1) they reasonably believed their employer's conduct was violating a law, rule, or regulation; (2) they performed a whistle-blowing activity described in N.J.S.A. 34:19-3(c); (3) an adverse employment action was taken against them; and (4) there is a causal connection between the whistle-blowing activity and the adverse employment action. Dzwonar, 177 N.J. at 462 (citing Kolb v. Burns, 320 N.J. Super. 467, 476 (App. Div. 1999)). An adverse employment action is one that results in a change in the terms and conditions of the employment, including termination, a reduction in compensation, or withdrawal of benefits.

Maimone v. City of Atlantic City, 188 N.J. 221, 235-36 (2006). However, "filing a CEPA claim 'does not insulate the complaining employee from discharge or other disciplinary action for reasons unrelated to the complaint.'" Hancock v. Borough of Oaklyn, 347 N.J. Super. 350, 360-61 (App. Div. 2002) (quoting Higgins v. Pascack Valley Hosp., 158 N.J. 404, 424 (1999)).

Where the plaintiff asserts a pretext theory, once plaintiff establishes the first three elements, the defendant must show a "legitimate, nondiscriminatory reason" for the adverse decision to counter the fourth element of a causal connection. Kolb, 320 N.J. Super. at 479. Once the defendant has done so, the plaintiff must raise a "genuine issue of material fact" as to whether the explanation is pretextual, or whether "the 'retaliatory discrimination was more likely than not a determinative factor in the decision.'" Ibid. (quoting Bowles v. City of Camden, 993 F. Supp. 255, 262 (D.N.J. 1998)).

The plaintiff does not need to provide direct evidence, but must show "some evidence, direct or circumstantial, from which a reasonable factfinder could conclude that defendants' proffered reasons were 'either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext).'" Id. at 480 (quoting Romano v. Brown & Williamson Tobacco Corp., 284 N.J. Super. 543, 551 (App. Div. 1995)). In the

10

absence of such evidence, and where a defendant has demonstrated a valid reason that justified an employee's termination, plaintiff's burden is not met, and summary judgment may be granted. See Massarano v. N.J. Transit, 400 N.J. Super. 474, 492 (App. Div. 2008) (stating retaliation was not shown where, even had plaintiff been able to meet the first three elements, defendant demonstrated plaintiff's demeanor was obstructionist and insubordinate, which justified her termination, and plaintiff would have had to meet her burden to show the reason was pretextual for her claim to survive summary judgment). While temporal proximity of a protected act and an adverse employment action "is one circumstance that may support an inference of a causal connection," Maimone, 188 N.J. at 237 (emphasis added), "[t]emporal proximity, standing alone, is insufficient to establish causation," Hancock, 347 N.J. Super. at 361.

Here, while plaintiff may have reasonably believed Meda was violating the Sunshine Act; the meeting with Holley was a whistle-blowing activity; and he was terminated, there is no competent evidence in the record to support a causal relationship. Nothing in the record supports the conclusion that Cheng-Avery and Loesch, who were solely responsible for plaintiff's firing, knew about his Sunshine Act report. Rather, Cheng-Avery did not appear to know about it at all, and Loesch stated he only knew about it when Holley was wrapping up

11

his investigation into the claims, which was several days after plaintiff was terminated. Gnirrep had no role in either plaintiff's hiring or termination, and while it is possible Gnirrep relayed that plaintiff requested a meeting with Holley to Cheng-Avery and Loesch, it is mere speculation. Further, Cheng-Avery and Loesch stated they decided to terminate plaintiff on or around May 23, which was the week before plaintiff's meeting with Holley.

Additionally, as required under Kolb, defendants presented documentation of plaintiff's poor performance that justified his termination, to which plaintiff was required to present "some evidence" that this reason was pretextual. While plaintiff argues the February memo and probation were pretextual as a result of his purported oral Sunshine Act report to Gnirrep in January 2016, there is no evidence, other than plaintiff's own assertion, that this oral report was ever made to Gnirrep in January 2016, or even if it was, that anyone else knew about it. Nor is there any evidence that the performance reports were fabricated, and plaintiff was in fact performing well, other than plaintiff's own bald assertions.

Because plaintiff produced no competent evidence from which a reasonable factfinder could conclude defendants' proffered reason for terminating him was a fabrication or did not motivate the termination, as

required under Kolb, 320 N.J. Super. at 480, summary judgment on the CEPA claim was proper.

III.

We now address plaintiff's NJLAD claims of a hostile work environment. Under the NJLAD, N.J.S.A. 10:5-1 to -49, it is unlawful to discriminate against an individual in employment compensation or in terms, conditions, or privileges of employment on the basis of sex or national origin.  N.J.S.A. 10:5-12(a).

Plaintiff argues that, as a Hispanic male, he is in a protected class, held a position for which he was objectively qualified, and presented evidence he suffered adverse employment actions as a result of his gender and national origin.  He asserts those employment actions were being deprived of two direct reports promised to him when he was hired; having tasks re-assigned from him to less qualified female employees; and being placed on a pretextual performance improvement plan, which eventually led to his termination.

Plaintiff argues that under Taylor v. Metzger, 152 N.J. 490 (1998), a single derogatory comment directed against a subordinate employee by a supervisor, under particular circumstances, can create a hostile work environment in violation of the NJLAD.  Plaintiff argues that Cheng-Avery's denial she used the word "spic" creates a fact issue that should have gone to a jury.

13

To state a claim for harassment under the NJLAD, a male Hispanic plaintiff must show: (1) the complained-of conduct would not have occurred but for the employee's gender or national origin; (2) it was severe or pervasive enough that; (3) a reasonable person would believe; (4) the conditions of employment were altered and the working environment is hostile or abusive. See Lehmann v. Toys R Us, Inc., 132 N.J. 587, 600, 603-04 (1993).

In determining whether conduct was severe or pervasive, the harassing conduct as a whole must be evaluated, not its effect on the plaintiff or the work environment. Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 196-97 (2008). "[N]either a 'plaintiff's subjective response' to the harassment, nor a defendant's subjective intent," controls whether a hostile work environment exists. Cutler v. Dorn, 196 N.J. 419, 431 (2008) (internal citations omitted) (quoting Lehmann, 132 N.J. at 613). When determining whether the conduct would cause a reasonable person to believe the work environment is hostile, the courts must consider the cumulative effect of the conduct, not just the isolated instances of conduct. Godfrey, 196 N.J. at 196-97. This requires an assessment of the totality of the circumstances, in which the court should consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

14

unreasonably interferes with an employee's work performance." Cutler, 196 N.J. at 432 (quoting Green v. Jersey City Bd. of Educ., 177 N.J. 434, 447 (2003)).

The "severe or pervasive" standard may be met by a single remark if a rational factfinder could reasonably determine, on the basis of plaintiff's evidence, that a discriminatory insult directed at him or her was, under the surrounding circumstances, sufficiently severe to have created a hostile work environment. Taylor, 152 N.J. at 498-500. This is to be viewed as a reasonable person similarly-situated to the plaintiff. Id. at 500, 506. Whether conduct is sufficiently severe "can be determined only by considering all the circumstances, and this determination is left to the trier of fact." Id. at 502 (quoting Nadeau v. Rainbow Rugs, 675 A.2d 973, 976 (Me. 1996)).

"Racial epithets are regarded as especially egregious and capable of engendering a severe impact." Ibid. "The meaning of a racial epithet is often a critical, if not determinative, factor in establishing a hostile work environment." Ibid. The word "spic" is a national origin epithet that under Taylor, even if only uttered twice, could have met the severity requirement for harassment, and the two uses of the word "spic," could, as a matter of law, sustain a hostile environment claim. However, the circumstances must be so extreme so as to actually, "from the perspective of a reasonable [person similarly-situated as

15

plaintiff], make the working environment hostile," id. at 500, and "severity and workplace hostility are measured by surrounding circumstances," id. at 506.

Here, the court's written decision reflects that it carefully parsed the record to reach the conclusion that the factual issues raised by plaintiff as to the alleged motivations or rationale behind the adverse employment actions he asserted—the lack of two hires, the allegedly reassigned tasks, and the performance improvement plan—did not raise a question for the jury. While the use of a national origin epithet even once or twice can, as a matter of law, in some circumstances meet the severe or pervasive standard to constitute a hostile work environment, plaintiff's theory was that he was placed on probation because he reported the offensive comments to Gnirrep of HR. However, even accepting as true that Cheng-Avery used the pejorative word, there is no evidence that Cheng-Avery or Loesch knew he reported this behavior to HR. Indeed, the only evidence that he reported the statements is his own uncorroborated testimony. He cannot rely on speculation that Cheng-Avery and Loesch came to learn of it and retaliated.

As to the gender-discriminatory comments, despite plaintiff's assertion that the "girl power" and "men are unworthy" comments were made to his co-workers, not only do those not rise to the level of severity of a racial or national

origin epithet, two comments over the course of a year were not pervasive, and plaintiff did not produce any evidence of these comments—no certifications or affidavits of the co-workers, and no e-mails or even any of his own documentation in support of these allegations. Further, there is no evidence of his purported reports to Gnirrep, and plaintiff did not follow up with him to ensure any action was taken or a report made.

Although plaintiff was denied the opportunity to hire the two direct reports as promised, no one was permitted to hire anyone because of a company-wide freeze. Thus, the entry of summary judgment is supported by the record.

IV.

Finally, plaintiff argues he should have been allowed to amend his complaint to add a claim for wrongful termination under the NJLAD to conform to the evidence. Plaintiff's complaint only alleged his probation was the result of discrimination, and his termination was because of his Sunshine Act report; he did not assert his termination was caused by his NJLAD claims of discrimination until his opposition to summary judgment. The court did not permit him to expand his claim, and plaintiff argues it should have, as a court's discretion to amend a complaint to conform to the evidence, even after judgment, should be liberally exercised under Rule 4:9-1 and -9-2.

A-3680-18T3

Under Rule 4:9-2, an amendment to the pleadings to conform to the evidence may be made upon motion of any party at any time, even after judgment, where issues not raised by the pleadings and pretrial order are tried by consent or without the objection of the parties. "The trial court's broad discretion to permit amendment to conform to the evidence is required to be liberally exercised," but where a "beyond the issues as framed" objection is made, it "must be exercised with due regard to the opportunity of the opposing party to meet the evidence." Pressler & Verniero, Current N.J. Court Rules, cmt. on R. 4:9-2 (2019) (citations omitted). "The opposing party will ordinarily be deemed to have been on notice sufficient to meet that evidence if the issue has been injected into the case prior to trial even if in a technically deficient manner." Ibid. (citations omitted).

Here, although plaintiff did not assert his termination was caused by his NJLAD claim in either his complaint or deposition testimony, it can be inferred in that he asserted in both his complaint and deposition that his NJLAD claim caused his probation and negative performance reviews, which defendants contend ultimately led to his termination. However, even had plaintiff been permitted to amend his complaint, a de novo review of the record in the light most favorable to plaintiff reveals he could not show the reasons defendants

A-3680-18T3

gave for terminating his employment were pretextual, making summary judgment appropriate and rendering the need to amend the complaint moot.

While plaintiff argues he has presented sufficient circumstantial evidence to create an issue of fact for a jury as to whether his termination was the result of his alleged poor performance or due to his national origin and gender, because he disputed all defendants' allegations of poor performance in the memorandum he wrote in response to being placed on probation, we disagree.

To address the difficulty of proving discriminatory intent for an adverse employment claim, because direct proof "is often unavailable or difficult to find," New Jersey adopted the procedural burden-shifting methodology in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), which allows a plaintiff to make his or her case through circumstantial evidence. Zive v. Stanley Roberts, Inc., 182 N.J. 436, 447 (2005). Under that methodology:

> (1) the plaintiff must come forward with sufficient evidence to constitute a prima facie case of discrimination; (2) the defendant then must show a legitimate non-discriminatory reason for its decision; and (3) the plaintiff must then be given the opportunity to show that defendant's stated reason was merely a pretext or discriminatory in its application.
>
> [El-Sioufi v. St. Peter's Univ. Hosp., 382 N.J. Super. 145, 166 (2005) (quoting Dixon v. Rutgers, the State Univ. of N.J., 110 N.J. 432, 442 (1988)).]

19

In a termination context, the elements of prong one, a prima facie case, are that (i) plaintiff was in the protected group; (ii) was performing his or her job at a level that met the employer's legitimate expectations; (iii) was terminated; and (iv) the employer sought someone to perform the same work after plaintiff left.  Zive, 182 N.J. at 450 (citing Clowes v. Terminix Int'l Inc., 109 N.J. 575, 597 (1988)).

To satisfy prong one, the evidentiary burden at the prima facie stage is "rather modest: it is to demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent, that discrimination could be a reason for the employer's action."  Id. at 447 (quoting Marzano v. Computer Sci. Corp., 91 F.3d 497, 508 (3d Cir. 1996)).

As to element (i) of prong one, it is undisputed that plaintiff belongs to a protected class.  As to element (ii), in a termination context, if the employee merely "adduces evidence that he [or she] has, in fact, performed in the position up to the time of termination, the slight burden of the second [element] is satisfied," and only the evidence of the plaintiff is to be considered.  Id. at 455. Performance markers by the employer are not to be considered at this stage, and plaintiff's proofs "can come from records documenting the plaintiff's longevity in the position at issue or from testimony from the plaintiff or others that [he or]

she had, in fact, been working within the title from which [he or] she was terminated." Ibid. Here, plaintiff had not been in his position very long, but it is not disputed he was "working within the title from which [he or] she was terminated," so he has met the second element of prong one.

As to element (iii), it is undisputed plaintiff was terminated. As to element (iv), it is undisputed that defendants did not hire anyone to fill plaintiff's position. While defendants argue this means plaintiff cannot make a prima facie case, it can be inferred that if Meda had not been bought by Mylan, Inc. and all their employees subsequently terminated, they would have sought to fill his position. Therefore, plaintiff has met prong (1) in asserting a prima facie case.

As to prong (2), however, defendants have provided sufficient evidence in the form of the depositions and certifications of plaintiff's direct supervisor Cheng-Avery and her supervisor Loesch, as well as documentation of plaintiff's negative performance starting the month after he was hired, as well as an outside report of his performance at the Las Vegas convention from the Emerson Group, to show plaintiff's employment was terminated because of his inadequate performance, which he was given a chance to improve, but did not. This was despite the initial probation memo, which indicated a sense of urgency by stating he must show "immediate and substantial improvement" before May 2016, and

21

if they did not see such, he would be "subject to additional action up to and including termination." This message was repeated in Cheng-Avery's weekly emails to plaintiff summarizing their meetings beginning April 21, which stated he was still not meeting performance improvement expectations and urged him to focus on achieving "significant and immediate improvement as requested."

As to prong (3), plaintiff is required to "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Id. at 455-56 (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)). The plaintiff must show this by a preponderance of the evidence. Id. at 449.

Here, plaintiff's proof that defendants' reasons are false is his response memorandum where he specifically denies all the accusations regarding his performance, which he contends he gave to Gnirrep to give to Cheng-Avery. However, other than this self-created assessment, plaintiff does not produce any competent evidence that the performance memorandum, the year-end performance review, or the 2015-2016 performance observations were false: he produced no certifications or affidavits from co-workers or others that attest to

his good performance; no copies of emails he purports Cheng-Avery sent him that praised him for his excellent work; and no copies of communications he alleges he received from Emerson Group sales persons refuting the Emerson Group report on his poor convention performance. Since he was on probation starting in March with a clear statement in the memorandum indicating termination was a potential consequence if he did not improve, plaintiff had ample notice and opportunity to compile this type of documentation in anticipation of potential termination.

As to whether a discriminatory reason was more likely than not the motivating or determinative cause of his termination, plaintiff asserts his alleged reports to Gnirrep about Cheng-Avery's alleged discriminatory comments—which are not corroborated anywhere by email, plaintiff's own documentation, or certifications—resulted in an orchestrated plan to cast plaintiff in a negative light and remove him from the organization. This is not a reasonable inference that may be drawn from the facts, but rather mere speculation, as there is no indication that Cheng-Avery ever knew of these purported reports by plaintiff to Gnirrep. Further, while plaintiff argues he was entitled to a follow-up assessment in May 2016, he was an at-will employee who was not entitled to any kind of pre-termination process.

In sum, the lack of competent evidence in the record makes summary judgment proper on all claims.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3680-18T3