**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2499-17T2

IN THE MATTER OF THE
ESTATE OF JANE E. GEHRKE,
     Deceased.

_____

Submitted April 29, 2020 – Decided June 29, 2020

Before Judges Koblitz, Whipple and Gooden Brown.

On appeal from the Superior Court of New Jersey, Chancery Division, Morris County, Docket No. P-0864-2006.

Alan R. Adler attorney for appellant/cross-respondent Jeryl Ehrhard.

Paul A. Woodford attorney for respondents/cross-appellants F. Scott Gehrke and Karen Fetchin.

PER CURIAM

    This estate dispute pits family members against each other over their mother, decedent Jane Gehrke's, estate. Plaintiff Jeryl Ehrhard appeals a July 11, 2017 Chancery Division order granting summary judgment to defendants, F. Scott Gehrke (Scott) and Karen Fetchin (Karen). Defendants cross-appeal from

a provision of the January 9, 2018 order denying plaintiff's motion for reconsideration that denied defendants counsel fees.[1]

Plaintiff argues certain requirements of the Rules of Court were disregarded and that issues of material fact exist precluding relief, and thus the summary judgment order was improvidently granted. Defendants argue they were entitled to counsel fees because plaintiff's motion for reconsideration was frivolous. Because our de novo review revealed no fatal procedural errors and plaintiff provided no competent evidence of wrongful conduct on the part of defendants in performing their fiduciary duties, and because the trial court correctly denied defendants attorney's fees, we affirm as to both the appeal and cross-appeal.

We discern the following facts from the record of the summary judgment motion including certifications of the parties. Decedent died in March 2006 and her will was admitted to probate April 25, 2006. Plaintiff's brother, Scott, and sister, Karen, were named co-executors. The beneficiaries of the estate were all of decedent's children—Scott, Karen, Jill Main, plaintiff, Russell Gehrke,

---

[1] As to the motion for reconsideration, plaintiff did not appeal that motion and only makes arguments in rebuttal to defendants' arguments that it was frivolous. Since plaintiff did not appeal nor brief the motion for reconsideration, that issue is not before us.

A-2499-17T2

Robbin Gehrke, and Lauren Stephens—as well as decedent's granddaughter Arianna Pelullo. At the time of decedent's death, her husband Forrest's estate was still being administered by co-executors Scott, Karen, and Russell.

Decedent and her husband were antique collectors, as well as collectors of items and papers of historical and cultural significance, all kept in the family home in Mountain Lakes, where they lived for over forty years. Sorting the home's contents was a large task undertaken primarily by Scott, Russell, Jill, and Karen. During the year it took to empty the house, they maintained the property and kept it secure.

While going through decedent's house, Scott found paperwork from 1959 for the sale of two paintings given to decedent by a great aunt. The paperwork represented that the paintings were on loan to the King Manor Museum in Jamaica, Queens, New York since 1920. The value of the paintings was unknown, and despite multiple contacts with the museum, the museum would not confirm the condition of the paintings or even if they were in their possession.

Attorney Jeffrey Bascelli was retained to assist with the administration of the estate. However, Bascelli did not inform defendants he was not responsible for filing the tax returns, whereas defendants thought he was and trusted he

3

would do so, and the estate incurred tax interest and penalties of $25,700.99 and $14,057.04, respectively, for late filing.

Defendants considered filing an action against Bascelli for not providing them with necessary guidance, but weighed the cost-benefit of pursing litigation and decided the penalties, which came out to $5000 per beneficiary, were not worth risking the costs of an attorney, experts, filing fees, and deposition costs for an uncertain result. Even had taxes been timely filed, some interest or penalties may have resulted from underestimates of the value of some assets. Dissatisfied with Bascelli's services, defendants then relied on advice from attorney Harrison Gardner.

Defendants conducted a beneficiary auction of items from the house in early January 2007; an inventory sheet detailed over 450 items from the estate up for bid by the beneficiaries, and the items were displayed along with a property listing. All beneficiaries received the list of items, and all had the opportunity to inspect the items as well as the residence.

The house sold in March 2007 for $865,000, and the proceeds were split between the estates. Forrest's estate also contained life insurance policies that were to go to decedent, and then to her estate.

A-2499-17T2

An initial informal accounting that had been managed and approved by Bascelli was sent to all beneficiaries in April 2010. All of the beneficiaries executed releases except Lauren and plaintiff. Plaintiff asked defendants for more documents, which they sent. After plaintiff still refused to sign releases, defendants, at the suggestion of Gardner, had certified public accountant (CPA) Peter Snyder prepare formalized accountings, which were sent to all beneficiaries after they were completed.

Decedent's estate also contained multiple retirement accounts. There were no beneficiaries listed on the accounts, and after consulting with Gardner, Snyder, consultants from Vanguard, and the Vanguard Custodial Agreement, Scott advised the beneficiaries they could not directly inherit the funds as IRA accounts, but that they would have to be liquidated and distributed to the estate as taxable income. While the accounts qualified for a five-year deferred payment, which would push the tax to the individual beneficiaries rather than the estate, it would only work if all beneficiaries agreed and refunding bonds were signed by all for each distribution. Defendants decided the estate would pay the one-lump sum payment at the conclusion of the five-year deferral period.

The accountings showed commissions due to the co-executors on the estate property, in accordance with N.J.S.A. 3B:18-14, of $91,202.41 and on

income, in accordance with N.J.S.A. 3B:18-13, of $16,198.41, for a total of $107,400.82. Subtracting sums already paid on the account between December 2009 and January 2010 to: Russell (shared commission), two payments each of $4263.40; Scott, two payments each of $34,106.30; and Karen, two payments each of $4263.30, the total still due to defendants was $22,134.82.

In February 2012, plaintiff requested more documents, which defendants supplied. Defendants heard nothing from plaintiff until October 2012, when plaintiff filed suit against them alleging defendants provided her limited and incomplete information regarding the status of the administration of the estate; defendants acted improperly and negligently; and after more than six years since decedent's death, plaintiff had not yet received a distribution of her share of the estate. Plaintiff alleged defendants breached their fiduciary responsibilities, claiming defendants made "substantial payments" of commissions to themselves out of the estate without court approval; they improperly paid commissions to Russell, who was not a co-executor of decedent's estate but only of Forrest's estate; and that they reported commissions on decedent's estate for services performed in connection with Forrest's estate to make up for their failure to report those commissions as a liability to Forrest's estate.

Plaintiff also contended defendants' late tax filing resulted in "significant penalties and interest," and alleged defendants mismanaged the retirement plans by liquidating them instead of electing the five-year payout, which generated substantial income tax liabilities. Plaintiff also asserted defendants should sue the museum to recover the paintings. Finally, plaintiff alleged the April 2010 accounting sent to her with the refunding bond and release, when compared with Forrest's estate, revealed some of the assets that were to go from Forrest's estate to decedent's estate were missing, which totaled $220,490.

The court entered a scheduling order restraining distributions or transfers of funds or assets for any reason without prior written consent of plaintiff. Defendants were ordered to provide plaintiff with records of the engagement agreement with Bascelli and copies of monthly statements issued by involved banks for each estate account, along with a ledger identifying all distributions and disbursements made by co-executors during the entire existence of the estate.

In October 2014, after a court-ordered mediation resolved some issues, plaintiff emailed the other beneficiaries, asserting the following unresolved issues remained: (1) legal fees for Bascelli, alleging his accounting was fraudulent and the estate should be reimbursed for his fees; (2) management of

retirement accounts, in that failure to timely distribute the accounts meant she would have to work an additional year, and she would limit her damages to $15,000 if the matter settled, but would ask for more if it did not; (3) executor commissions; (4) plaintiff's legal fees; (5) completion of estate administration, asserting that Karen and Scott should be "closely supervised" if permitted to continue administering the estate, and that the bulk of assets should be distributed within thirty days and closed out within ninety days; (6) Snyder's accounting fees, asserting he should be paid at bookkeeper rates; (7) legal fees of defendants Scott and Karen; and, for the first time, (8) high-value assets allegedly taken from the estate.

While plaintiff claimed certain allegedly high-value items were missing from the estate, defendants asserted the estate never contained those items. However, plaintiff alleged the items were "fenced" and put up for bid at auction house Bonhams. She sought to depose Bonhams' representatives, and requested files generated or assembled by Bonhams related to: appraisals or auctions of property for decedent's estate; all beneficiaries; and other named individuals. Plaintiff also subpoenaed files related to auctions (Lots) of six items: (1) a first edition copy of The Sun Also Rises; (2) a first edition copy of The Beautiful and the Damned; (3) a 1790 United States Census Document signed by Thomas

Jefferson; (4) The First Wall Map of the Entire Continental United States by John Melish; (5) a photograph of Abraham Lincoln; and (6) a photograph of the Andrew Johnson impeachment committee. Plaintiff further asked for entire files of anyone else connected to the enumerated items.

Bonhams responded that the only party named in plaintiff's request who had an account at Bonhams was Gardner, but there was no record of any purchase or consignment tied to him. As to the Lots for the six items, Bonhams reported they "were consigned through five different and unassociated accounts, none of which appear to be associated in any way with any of the [n]amed [p]arties." Bonhams further stated the Lots originated from "various, distant geographic locations" which they asserted suggested they "were not improperly consigned from [decedent's] [e]state, but rather were separately floating in the stream of commerce long prior to their consignment to Bonhams." Bonhams also stated the six items were not necessarily unique in that there were varying numbers of all those items in existence.

Bonhams further contended

> based on the foregoing we simply have no reason to believe that the Lots offered through Bonhams of items that exist in multiples are the same physical copies as the [e]state alleges were once in its possession. The statements in [plaintiff's] [e]mail elaborating on the family's history, while fascinating, do not constitute the

type of salient details which would support a positive identification of the specific Lots. Neither does the "provenance" document provided . . . while it provides plausible provenance for a copy of the 1790 census document (of which it bears repeating that at least six other copies have been sold since 2004), it does not tie [decedent's] document to the Lot offered through Bonhams, nor does it provide any justification why this alternate provenance should be substituted for the Gideon Granger provenance with which the Lot was offered at both Bonhams and Sotheby's.

In fact, [plaintiff] has not produced any information, including a formal theft report or historic family documents such as appraisals or inventories, which confirms the [e]state's assertion that such items were ever in the [e]state's possession. We do not mean to sound dismissive in the face of what is no doubt a trying experience for [plaintiff] and her family. However, on the basis of the material provided to us, we simply cannot conclude that the Lots offered through Bonhams have anything to do with the [e]state.

Bonhams refused to offer plaintiff confidential client information related to the Lots, but did later state it was willing to provide plaintiff with names and contact information for the consignors of the six items, as well as copies of the contract paperwork for each consignor.

On or around February 2016, defendants moved to dismiss, as the case was three years old and plaintiff had not named an expert or produced an expert's report supporting the allegations in her complaint. In support of the motion, defendants presented Scott's sixty-one-numbered-paragraph certification.

Defendant's asked the court to dismiss the complaint with prejudice; to allow the conclusion of the administration of the estate and disbursal of funds to the beneficiaries; and to approve the distribution of the balance of executor commissions. Defendants also asked the court to order plaintiff to reimburse the estate for the incremental attorney and accounting fees incurred as a result of her frivolous claims, which had not benefitted the estate, but rather served to delay and frustrate its finalization.

All beneficiaries except plaintiff filed certifications in support of defendants' motion, asserting Scott's certification accurately reflected the facts in the case, including agreements reached by all beneficiaries that gave plaintiff the rights to the paintings and that reimbursed her for her portion of the tax penalties and interest. Robbin, Lauren, Jill, and Arianna added they were aware of how hard defendants worked on the estate, believed defendants earned the commissions listed in Scott's certification, and asked the court to approve them.

Plaintiff opposed defendants' motion. She reiterated many of the allegations of her prior certifications, including that the tax interest and penalties issue was not resolved. She also continued to assert the retirement accounts were improperly liquidated, causing her to suffer damages in that "[p]roper distribution would have allowed the heirs to manage the assets to best meet their

11

individual retirement and tax goals," offering a hypothetical of how she would have used the alternate distribution to her personal benefit.

Plaintiff further alleged that while her mother suffered from dementia and her father was ill with terminal brain cancer, valuable items disappeared from the home.  She claimed she became aware of numerous items she "believe[d]" belonged to her mother advertised for sale in "newsprint, internet articles, auction websites and even on television," including the 1790 census which she contended her father found in a box from decedent's cousin's estate.  Plaintiff asserted she and her father "compared Jefferson's document signature to a replica of the Declaration of Independence" and that it was one of her "favorite memories" with her father.  Plaintiff alleged the document was auctioned in 2010 at Sotheby's for $68,000, and that further research revealed it was offered for sale in a prior Bonham's auction in October 2010.  When she researched that auction she "was shocked to find many of [decedent]'s missing items were included among the offered lots" including an Indian deed related to the New Paltz Huguenot settlement, which plaintiff claimed was one of the items found in decedent's house and held out of the family auction for appraisal.  Plaintiff also asserted there were valuable antique comic books from decedent's cousin's estate, which defendants did not report finding.

A-2499-17T2

Plaintiff asserted these auctioned items were "fenced" by trade dealers in Massachusetts, Los Angeles, and Maine through people with tenuous connections to her siblings. Plaintiff offered other unproven connections that were untethered to any proofs for additional items allegedly from the estate that she considered "high value artifacts." All of her assertions were denied by her siblings.

In support of defendants' summary judgment motion, Snyder submitted a certification attesting he had been an accountant since 1978, became a CPA in April 1984, and had prepared over three hundred fiduciary accountings including estates, trusts, and guardianships; the guardianship accountings were prepared for presentation and approval by the courts. He stated he did not know or have any contact with the executors or beneficiaries prior to being retained.

Snyder certified it was his understanding one of the beneficiaries found Bascelli's informal accounting format unacceptable, so Gardner contacted Snyder in the fall of 2010 to bring it into a formal accounting format. Snyder found Bascelli's accounting "inadequate and not salvageable" so he started over with an informal accounting for decedent, and also prepared related accountings for Forrest's estate, as well as for a testamentary marital share trust and a credit

shelter trust. As of his certification, he had created six accountings related to decedent's and Forrest's estates.

As to the co-executor commissions paid to Russell as belated payments for work done on Forrest's estate paid out of decedent's estate, which plaintiff alleged was improper and resulted in a loss to the estate, Snyder certified: the unpaid commissions for Forrest's estate would be deductible on a future federal fiduciary income tax return when the commissions were paid; Snyder consulted with Gardner, who specialized in estate and trust work, and was informed the back commissions were payable; and Snyder's understanding of the commission attributed to Russell from decedent's estate was that it was taken out of Scott and Karen's commissions, as the commissions claimed on decedent's federal estate return matched the commissions paid from decedent's estate.

As to the allegedly-missing funds, Snyder certified he re-reviewed all documentation, created a spread sheet outlining the disbursement of funds from Gardner's trust account, and reviewed copies of insurance checks, deposit slips, and the bank statements for the various accounts, and found all insurance proceeds were accounted for, and that the executors "properly accounted for all funds and promptly deposited them in the proper accounts. Nothing was misplaced or lost."

 A-2499-17T2

As to the retirement accounts, Snyder certified he, Gardner, and Scott discussed them and reached the conclusion the beneficiaries could not directly inherit the funds as IRA accounts but that they would have to be liquidated and distributed to the estate as taxable income.

At the hearing, defendants argued several of the issues plaintiff alleged in her complaint were resolved at the August 2014 mediation. Specifically, all other beneficiaries had agreed to reimburse plaintiff for her share of the tax penalties and interest out of their own shares of the estate, and to give plaintiff rights to the two paintings should she successfully recover them from the museum through her own efforts. Plaintiff's counsel conceded the other beneficiaries agreed to reimburse plaintiff for her portion of the tax interest and penalties, and that the issue of the two paintings was resolved. However, plaintiff asserted the retirement accounts should not have been liquidated and that she suffered a loss from higher tax liability as a result, and contended the issue of Bascelli's fees was also still in dispute, as she did not agree he should be paid due to his "poor work." When the court asked for evidence of the existence of allegedly missing artifacts in the estate, plaintiff's counsel conceded plaintiff never saw them herself, except for the 1790 census.

A-2499-17T2

The court granted defendants' summary judgment motion, finding plaintiff did not substantiate her claims "beyond mere allegations and bald assertions." As for the tax interest and penalties, the court found while plaintiff in her opposition stated the estate should be reimbursed by defendants, "such remedy would ultimately render the same relief" as the currently-agreed-upon remedy where the other beneficiaries would reimburse plaintiff for her share of the loss. The court further found plaintiff had not demonstrated any portion of the penalties or interest was due to the neglect of defendants, and that defendants asserted the penalties were due to the complexity of both decedent's and Forrest's estate, their reliance on Bascelli's legal advice to obtain title of the paintings before filing, as well as prioritizing cleaning out the residence to secure and distribute personal property assets and financial records. Therefore, the court granted summary judgment on this claim.

Plaintiff had taken the rights to the paintings, so summary judgment was also granted as to this claim. As to the life insurance policies and the sale of the house, the purportedly missing funds, plaintiff conceded the funds "reappeared in the new estate accounting" and the court found they were reflected in Snyder's accountings and provided to plaintiff, so summary judgment was granted as to this claim as well.

16                                                        A-2499-17T2

The court found plaintiff had not provided any evidence to sustain her allegations that defendants mismanaged the retirement accounts. It noted defendants consulted with counsel, Snyder, consultants from Vanguard Securities, and reviewed the Vanguard Custodial Agreement "in order to make a well-informed decision as to managing the distributions," and found their handling was on the advice of financial advisors at Vanguard Securities and "appears to be a prudent exercise of the responsibilities" under N.J.S.A. 3B:20-11.3(a), (b), and (e), as well as In re Beales Estate, 13 N.J. Super. 222, 228 (App. Div. 1951). The court noted plaintiff neither provided an expert report to show defendants' handling of the retirement accounts was incorrect or contradicted Snyder's conclusions, nor did she provide evidence they disregarded professional advice they received, and granted summary judgment as to this claim.

The court further found the loss plaintiff asserted in tax implications related to commissions belatedly paid to Russell for his work on Forrest's estate was refuted by Snyder and Gardner, in that back commissions were payable and deductible on future tax returns. Because plaintiff did not dispute the work done on behalf of the estate, and there was no showing of bad faith in the commissions

17

claimed by defendants, the court granted summary judgment as to that claim as well.

As for the payments to Bascelli, the court found defendants appropriately discharged their duties in hiring an attorney to aid in administering the estate, under N.J.S.A. 3B:14-23(l), and in subsequently retaining a different attorney when they became dissatisfied with his services. The court found defendants made a business decision not to pursue a claim against Bascelli, and that there was no indication of willful or negligent conduct by defendants, and granted summary judgment on this claim.

Regarding the alleged conversion of personal property, the court found none. The court noted the burden of showing there are more assets in an estate than were acknowledged by the executors in their inventory or account is on the exceptants, and their allegations "must be sustained with reasonable certainty" under In re Estate of Perrone, 5 N.J. 514, 521 (1950), and found plaintiff did not meet that burden. Instead of stating her claim at the 2007 beneficiary auction or in her 2012 court filings, plaintiff first raised the issue of missing assets at the August 2014 mediation, and provided only bald assertions. Plaintiff's subpoena to Bonhams, which the court noted was served without copying defendants' counsel, revealed no connections to any interested parties, and plaintiff's theory

regarding contacts of beneficiaries selling items on their behalf was unsupported.

The court found defendants were permitted to engage Snyder as an accountant under N.J.S.A. 3B:14-23(x), and since plaintiff provided no expert report to support her claim that his fees were excessive, summary judgment was granted on this claim.

Finally, the court ruled neither party was entitled to counsel fees, as plaintiff had not brought a successful challenge, but advanced weak claims without support, and defendants had not submitted a certification of services by counsel, complied with the requirements of Rule 4:42-8, nor provided plaintiff written notice of their intention to seek sanctions as required.

In August 2017, plaintiff moved for reconsideration, asserting the process was not compliant with court rules, in that the order was prepared in part by defendants and was not submitted to plaintiff for review prior to the order's execution. Plaintiff contended none of the methodologies were followed under Rule 4:42-1(b) or (c), and that this prejudiced plaintiff's interest in that she was not given the opportunity to comment on the order "in its formative stage."

Plaintiff also claimed she did earlier verbally object and question where certain items were, including her mother's Chippendale secretary desk, which

she claimed she recently learned was auctioned and sold, referencing an attached photo. Plaintiff contended the 2007 inventory was only for lower-value personal items, and that an inventory of "investment grade collectibles" was never shared nor included in Snyder's accounting statements. Plaintiff also challenged that the interest and penalties issue was resolved.

Plaintiff alleged more missing items from the estate including an "extensive collection of rare stamps and coins," and claimed that after the hearing she "became aware" a sizable portion of the stamp collection had been auctioned by Phil Weiss Auctions of Oceanside, New York, and a review of the website indicated the proceeds were "approximately ten million dollars." She stated an internet search identified David Cobb as the owner of the Newport Harbor Stamp Company, that she "obtained a video file of the 'Newport' auction where [she] identified a man who appears to match a photo of David Cobb" and argued defendants and Cobb are seen on the video celebrating when the price reached a million dollars. Plaintiff claimed shortly thereafter she "had a discussion" with various law enforcement agencies, including the Federal Bureau of Investigations (FBI).

Plaintiff claimed she received a call on June 16, 2017, from an FBI special agent assigned to her criminal complaint who stated he would set up a series of

meetings in the near future, and apologized for the year-long delay in contacting her; plaintiff attached a call log to support this claim. She also claimed she had been corresponding with another detective with another law enforcement organization that "may be related to the actions" of defendants and may impact decedent's estate, but that the detective "has not authorized [her] to reveal the details of our correspondence."

Plaintiff also asserted she was entitled to attorney's fees, as her discovery of the one million dollar stamp collection, which would "likely" result in it being restored to the estate, as well as the $220,900 that she alleged would not have been accounted for had she not brought defendants' attention to it, benefitted the estate.

Scott executed a certification responding that the desk referenced by plaintiff was never mentioned by her, and that decedent's desk was a period maple Queen Anne Lid Desk, c. 1780, not a Chippendale desk, that it was contained in the inventory, and Lauren was the successful bidder at $3900.

Scott noted that in eleven years, plaintiff never referenced a missing stamp and coin collection. Scott asserted their parents only had a moderately-sized coin collection of unknown value many years earlier, and decedent built a "small stamp collection of little value" from cancelled foreign postage stamps affixed

21

to postcards. No beneficiaries who searched the house after decedent's death found a coin collection. Scott certified no collection records were found and he did not believe there were any; defendants last saw the coin collection in the early 1970's when Forrest was out of work and he and decedent consulted valuation books, and it had not been seen since. Scott denied that he or anyone else remotely connected to the estate was present at the referenced stamp auction. He asserted plaintiff's claims were frivolous, and asked for counsel and accounting fees incurred in defending the motion for reconsideration.

The court denied the motion for reconsideration in an order filed January 9, 2018, accompanied by a written statement of reasons, wherein it considered plaintiff's new evidence which "[the party] could not have provided on the first application." (citing D'Atria v. D'Atria, 242 N.J. Super. 392, 401 (Ch. Div. 1990)).

As to the alleged new material facts—that the FBI was currently investigating theft; a high value stamp and coin collection had been unlawfully converted by defendants; and a valuable desk had gone missing—the court found the claim without merit, as the estate was more than ten years old, and at no point was there ever any indicia any items plaintiff was now claiming as missing were ever in the estate. The court rejected plaintiff's self-serving statements and

comments used to corroborate her allegations, and found her new round of bald assertions were not probative nor competent, as required by <u>Fusco v. Board of Education of the City of Newark</u>, 349 N.J. Super. 455, 462 (App. Div. 2002). The court found that after ten years, at least six accountings, all of which had been provided to plaintiff, and years of litigation, it was "wholly unreasonable that [p]laintiff continues to ostensibly identify missing items belonging to the estate," and that she could have reasonably brought these items to the attention of the court in her initial complaint.

The court also rejected defendant's assertion of a procedurally-deficient order, noting the order

> was decided on motion, complete with opposing papers filed by [p]laintiff's [c]ounsel. Plaintiff's contention is that she was not afforded the opportunity to object to the form of order. However, [p]laintiff's opposition to [d]efendants' motion was her objection to that form of order. Plaintiff failed to show that there was a "genuine issue [of] material fact" present, and as such [d]efendants prevailed in their motion for summary judgment.

The court also noted the order "does not abrogate any agreements between the parties, as it merely dismisses [p]laintiff's [c]omplaint and lifts [e]xecutor restrictions imposed by this [c]ourt. Furthermore, there has been no showing that judicial enforcement of those agreements is necessary."

23

The court did not award defendants sanctions pursuant to N.J.S.A. 2A:15-59.1, however, because this was a motion for reconsideration, "not a pleading as required by the statute," and therefore the court did not have the authority to do so, citing Lewis v. Lewis, 132 N.J. 541, 545 (1993). This appeal and cross-appeal followed.

We review a grant of summary judgment de novo, applying the same standard as the trial court. Woytas v. Greenwood Tree Experts, Inc., 237 N.J. 501, 511 (2019) (citing Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)).

On appeal, plaintiff argues that defendants failed to set forth a statement of material facts in their motion for summary judgment as required by Rule 4:46-2(a) and (b), which did not allow the court or plaintiff to identify with specificity the purported uncontested facts supporting their motion.

Rule 4:46-2(a) states the party moving for summary judgment

> shall . . . serve[] . . . a brief and a separate statement of material facts . . . [which] shall set forth in separately numbered paragraphs a concise statement of each material fact as to which the movant contends there is no genuine issue together with a citation to the portion of the motion record establishing the fact or demonstrating that it is uncontroverted. . . . A motion for summary judgment may be denied without prejudice for failure to file the required statement of material facts.
>
> [(Emphasis added).]

Here, with their motion, defendants submitted a certification that set out many facts in sixty-one separate, numbered paragraphs with references to the complaint and to the record.  Plaintiff then responded to defendants' certification with her own certification alleging facts in dispute.  Further, the Rule indicates a motion for summary judgment may be denied without prejudice, which indicates dismissal on these grounds is discretionary.  Because defendants set forth facts in numbered paragraphs and cited to the record, and plaintiff had the opportunity to and did respond, this fulfilled the purpose of a separate statement of facts and it is difficult to see how plaintiff might have been prejudiced in any way by it.  Therefore, this argument is without merit.

We also reject plaintiff's argument that the court's order did not comply with the requirements of Rule 4:42-1.  Here, as the court noted, the motion was decided by it, not settled by the parties, and the order, along with its sixteen-page statement of reasons, "accurately memorialize[d] [the] court['s] dispositions."  The court was not required to memorialize issues on which the parties agreed separately, as those decisions were not made by the court, but between the parties.  As the court pointed out, nothing in the order interfered with those agreements, and there was no showing that those agreements required enforcement.  Further, nothing in the rules precluded plaintiff from submitting

A-2499-17T2

her own proposed order containing the settled issues she wanted to be enforced, and as the court also noted, the motion was fully briefed, there was a hearing, and plaintiff's opposition to the motion was also her opposition to the proposed order.

Plaintiff further asserts material issues of fact precluded the entry of summary judgment. Based on our review of the record, this argument is without merit.

Under Rule 4:46-2(c), a motion for summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." A genuine issue of material fact exists where, when viewed in the light most favorable to the nonmoving party, a rational factfinder could find in favor of the non-moving party. Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 523, 540 (1995). While a court ruling should not bar a "deserving litigant" from trial, "it is just as important that the court not 'allow harassment of an equally deserving suitor for immediate relief by a long and worthless trial.'" Id. at 540-41 (quoting Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 77 (1954)).

"[W]here there is a [p]rima facie right to summary judgment the party opposing the motion is required to demonstrate by competent evidential material that a genuine issue of a material fact exists," to protect against "groundless claims and frivolous defenses."  Heljon Mgmt. Corp. v. DiLeo, 55 N.J. Super. 306, 312 (1959) (citing Robbins v. Jersey City, 23 N.J. 229, 240 (1957)).  "If this requires the non-movant to produce all his evidence, he must do so to establish clearly the existence of a genuine issue of a material fact," especially where the evidence is "peculiarly within the non-movant's knowledge or control or where he has exclusive access to such proof."  Id. at 313.

It is not enough to produce "bare conclusions lacking factual support" or "self-serving statements."  Worthy v. Kennedy Health Sys., 446 N.J. Super. 71, 85 (App. Div. 2016) (citations omitted).  The non-movant must produce "competent evidential material beyond mere speculation and fanciful arguments."  Id. at 85-86 (quoting Cortez v. Gindhart, 435 N.J. Super. 589, 605 (App. Div. 2014)).

Although a court is not to make credibility determinations, the court is not required "to turn a blind eye to the weight of the evidence; the 'opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'"  Triffin v. Am. Intern. Grp., Inc., 372 N.J. Super. 517, 523-24

27

(App. Div. 2004) (quoting Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d. Cir. 1992)). "It is well settled that the burden of showing that there are more assets in an estate than are acknowledged by the executors in their inventory or account rests upon the exceptants, and that their contentions must be sustained with reasonable certainty." Perrone, 5 N.J. at 521 (citing In re Schlosser, 119 N.J. Eq. 201 (E. & A. 1935)).

Here, plaintiff did not demonstrate missing assets, and her allegations are not supported by competent evidence, but are merely self-serving statements, speculation, and fanciful arguments not grounded in fact. Further, her allegations of an FBI or other investigations are unsupported, as she only produced a telephone log showing there were two calls, one incoming and one outgoing, between her phone number and the phone number associated with her local FBI field office, but no indication of what, if anything, was discussed relating to the estate. The allegations of a "sophisticated" operation where items were "fenced" by alleged contacts of the other beneficiaries to hide their trail are speculative and not supported by competent evidence.

We also reject plaintiff's argument that issues related to co-executor commissions, alleged mismanagement of the retirement accounts, Russell's

commission payment, plaintiff's legal fees, Snyder's fees, and the tax penalties and interest for late tax return filing remain "wholly unresolved."

Executors and administrators of an estate are fiduciaries acting on behalf of the estate's creditors and beneficiaries. 7 Alfred C. Clapp & Dorothy G. Black, N.J. Practice, Wills and Administration § 982 (Rev. 3d ed. 2019 update) (citing In re Meyer's Estate, 63 N.J. Super. 336, 350 (App. Div. 1960)). A fiduciary is permitted to employ and compensate accountants for services rendered to the estate, including preparing accountings, without reduction in commissions due the fiduciary, N.J.S.A. 3B:14-23(x). Here, plaintiff did not produce any expert to show Snyder, a CPA, should be paid at bookkeeper rates. Rather, his certification and billing statements appear complete and thorough, defendants thought he did an excellent job, and plaintiff provides no support for her position other than her own statements and opinions.

When reviewing a fiduciary's conduct, New Jersey courts have not held fiduciaries responsible for consequences of their actions where they do not result from "fraud, gross carelessness, or indifference to duty." Beales, 13 N.J. Super. at 228-29. Here, plaintiff has not shown the late tax filings were the result of "fraud, gross carelessness or indifference to duty," and the record reflects the late filing was a result of a misunderstanding that Bascelli would handle the

filing, as well as defendants' prioritization of organizing the many assets and preparing the house for sale. Further, the tax penalties and interest prompted defendants to change attorneys. It appears this was at most a mistake or imperfection of human judgment, not fraud, gross carelessness, or indifference to duty, and summary judgment was appropriate on this point.

As to a fiduciary's handling of investments, the Prudent Investor Act, N.J.S.A. 3B:20-11.1 to -11.12, sets forth requirements for a fiduciary of a trust, and a fiduciary "is not liable to a beneficiary to the extent that the fiduciary acted in reasonable reliance on those express provisions." N.J.S.A. 3B:20-11.2. "The prudent investor rule expresses a standard of conduct, not outcome," and compliance "is determined in light of the facts and circumstances existing at the time of the fiduciary's decision or action." N.J.S.A. 3B:20-11.9.

Here, plaintiff merely disagrees with the way defendants distributed the retirement accounts. However, defendants fulfilled their fiduciary duty under the statute in consulting with an attorney, a CPA, Vanguard consultants, and the Vanguard Custodial Agreement in making a decision they thought best for the beneficiaries. While plaintiff did not like the outcome, she does not show that defendants' conduct was improper. Nor has plaintiff produced any expert to show the course of action taken by defendants was not reasonable, but only

offers a hypothetical of how she herself might have benefitted were the distribution made her preferred way.  Therefore, summary judgment on the issue of the retirement accounts was appropriate.

Moreover, we discern no error in the court's determination defendants were entitled to commissions.  N.J.S.A. 3B:18-14 permits commissions of 5% on the first $200,000; 3.5% on the excess over $200,000 up to $1,000,000; 2% on the excess over $1,000,000; and an additional 1% of the total for each additional fiduciary.  N.J.S.A. 3B:18-13 permits commissions of 6% on all income.  The accountings produced by Snyder reflect these percentages, and the record reflects defendants performed their fiduciary duties as to the estate.  As the court noted, plaintiff did not dispute the time and effort defendants put into administering the estate, but merely makes bald assertions that they did it in a way she does not agree with and makes accusations not based in fact that they committed malfeasance.  As for fees paid to Russell out of decedent's estate, defendants provided Snyder's certification to show this was not improper, while plaintiff again does not produce anything in response but her own statements and opinions.

A-2499-17T2

Plaintiff also argues "the mediation proceeding failed and no enforceable written or verbal agreements emerged therefrom," so the court's determination that several issues raised by plaintiff were resolved in mediation was incorrect.

Under Rule 1:40-6(a), the court may refer a probate action to mediation. After Willingboro Mall was decided in 2013, if a mediation results in total or partial agreement, to be enforceable it must be reduced to writing and signed by each party, but does not need to be filed with the court. R. 1:40-4(i); see also Willingboro Mall, Ltd. v. 240/242 Franklin Ave., L.L.C., 215 N.J. 242, 245 (2013).

Here, the mediation took place in 2014, and it does not appear the agreements as to the paintings or the tax penalties and late filing fees were reduced to writing and signed by the parties. However, whether or not an enforceable agreement resulted from mediation is not relevant, as a de novo review of the record does not show that the issues of the paintings or the tax penalties and interests were a result of improper exercise or neglect of defendants' fiduciary duties that would preclude summary judgment.

Further, a party conceding a material fact at trial may not argue the contrary on appeal. Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2019); First Am. v. Vision Morg., 298 N.J. Super. 138, 143 (App. Div.

1997); <u>Ji v. Palmer</u>, 333 N.J. Super. 451, 459 (App. Div. 2000). Here, plaintiff's counsel conceded, on the record at the summary judgment hearing, that the parties reached agreement as to the paintings and the penalties and interest for the late tax filings, so plaintiff is precluded from arguing on appeal that those matters remain unsettled.

We now address both parties' claims for fees. One exception to the American rule against awarding attorney's fees in litigation is in probate actions, where it appears "the contestant had reasonable cause for contesting the validity of the will," in which case "the court <u>may</u> make an allowance to the proponent and the contestant . . . ." <u>Rule</u> 4:42-9(a)(3) (emphasis added). Counsel fees are generally permitted "except in a weak or meretricious case." Pressler & Verniero, cmt. 2.3 on <u>R.</u> 4:42-9 (citations omitted).

Here, plaintiff did not challenge the validity of the will, but contends she acted to expand the assets for the benefit of all the beneficiaries. However, her claims are not grounded in fact, and are no more than mere speculation not supported by the record.

In their cross-appeal, defendants assert plaintiff did not comply with <u>Rule</u> 4:49-2, which only permits a motion for reconsideration where there is a palpably incorrect or irrational basis for a decision, or where the court did not

consider or failed to appreciate the significance of probative, competent evidence, under D'Atria, 242 N.J. Super. at 401. Defendants also assert rebutting the speculative claims of the allegedly missing items (the desk, the coin collection, and stamp collection) required time and effort, and that plaintiff is delaying the settlement of the estate and continues to manufacture claims against them and others to keep the litigation going, and the only way to stop her is to impose sanctions for harassing and frivolous litigation.

N.J.S.A. 2A:15-59.1(a)(1) states that a prevailing party in a civil action may be awarded reasonable litigation costs and reasonable attorney fees if the court finds "a complaint, counterclaim, cross-claim or defense of the non-prevailing person was frivolous." As the trial court here noted, the New Jersey Supreme Court pointed out that N.J.S.A. 2A:15-59.1 refers to only a "complaint, counterclaim, cross-claim or defense," and "[i]n the face of such unambiguous language, [] decline[d] to interpret the statute to apply to motions." Lewis, 132 N.J. at 545. Therefore, there are no grounds for granting defendants attorney's fees for plaintiff's motion for reconsideration under N.J.S.A. 2A:15-59.1.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

34